IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

William Buck,

Plaintiff,

v.

Wexford Health Sources, Inc., et al.,

Defendants.

Case No. 15-cv-9158

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff William Buck, an inmate within the Illinois Department of Corrections, has for years suffered from a number of health conditions, including chronic eczema on his foot and various gastrointestinal issues. In 2015, Plaintiff sued prison administrators Warden Tarry Williams, Debbie Knauer, and Jill Parrish; physicians Dr. Saleh Obaisi and Dr. Alma Martija; and the doctors' employer, Wexford Health Sources, Inc., under 42 U.S.C. § 1983, alleging that they displayed deliberate indifference to his serious medical needs and that Drs. Obaisi and Martija retaliated against him for filing grievances in the state prison system. The Defendants have now moved for summary judgment against Plaintiff. [196]; [199]. For the reasons stated below, this Court grants their motions for summary judgment [196]; [199].

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

1

matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 250 (internal quotations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id*. (citation omitted).

# BACKGROUND[1]

## I. Parties

Plaintiff, an inmate in the custody of the Illinois Department of Corrections (IDOC), currently resides at Pontiac Correctional Center. [200] at ¶ 1; [197] at ¶ 1.

At all times relevant to Plaintiff's claims, Defendant Debbie Knauer served as the chairwoman of the Administrative Review Board (ARB) for the IDOC; Defendant Jill Parrish acted as the grievance officer at Stateville Correctional Center; and Defendant Tarry Williams served as the warden at Stateville. [200] at ¶¶ 2–4.

Defendant Wexford contracts with the IDOC to provide medical services to prisoners. [197] at ¶ 3. Defendant Dr. Saleh Obaisi, who died in December 2017, served as a licensed physician and Medical Director of Stateville Correctional Center. *Id.* at ¶ 4. At relevant times, Defendant Dr. Alma Martija was a medical doctor employed by Wexford working at Stateville. *Id.* at ¶ 5. Dr. Martija is not board-certified. [221] at ¶ 16.

## II. Plaintiff's Medical Conditions Prior to 2013

By early 2011, Plaintiff had been diagnosed with chronic eczema, characterized by "incidents of eruptions" all over his body, including his feet and toes. [197] at ¶ 9. From December 2011 to September 2013, when Plaintiff first arrived at Stateville, Plaintiff continued to suffer from chronic eczema with frequent flare-ups. *Id.* at ¶ 11.

---

[1] This Court takes the following facts from the Wexford Defendants' statement of facts [197], the IDOC Defendants' statement of facts [200], and Plaintiff's statements of additional facts [206]; [221]. The facts are undisputed unless otherwise noted.

Plaintiff also began experiencing abdominal issues in 2010. [197] at ¶ 10. Through 2012 and 2013, Plaintiff complained of abdominal pain, lumps in his stomach, and blood in his stool. *Id.* at ¶ 12. Prior to entering Stateville in 2013, Plaintiff saw gastrointestinal specialists at the University of Illinois at Chicago (UIC) for his abdominal complaints; he also underwent a colonoscopy and CT scan. *Id.* at ¶ 13. The GI specialists at UIC recommended a treatment plan consisting of a high fiber diet. *Id.* at ¶ 14.

### III. Medical Treatment at Stateville in 2013–2014

Plaintiff entered Stateville on September 13, 2013. [197] at ¶ 17. A few months later, in January 2014, Plaintiff saw staff physician Dr. Aguinaldo complaining of left lower abdominal pain for several months, with vomiting and blood for two and a half months. *Id.* at ¶ 18. At the time, he presented with regular bowel movements, no fever, soft abdomen, slight tenderness, and no organ enlargement. *Id.* Dr. Aguinaldo diagnosed Plaintiff with "lower abdominal pain, questionable etiology," and provided him a treatment plan that included anthem tabs, an abdominal x-ray, and follow up in the health care unit (HCU). *Id.* His x-ray later revealed a normal bowel pattern with no unusual masses or calcifications. *Id.*

The next month, on February 6, 2014, Plaintiff saw Dr. Obaisi for abdominal discomfort, at which time Dr. Obaisi diagnosed Plaintiff with spastic bowel syndrome and prescribed Bentyl, an antispasmodic. *Id.* at ¶ 20. About a week later, on February 15, 2014, Plaintiff saw a nurse for pain on the left side of his chest. *Id.* at ¶ 21. Plaintiff was given a physical exam and EKG, and then Norco as treatment.

4

*Id.* He saw a Dr. Ann Davis the same day for a follow-up appointment; she assessed that Plaintiff's chest pain was most likely due to "gastritis secondary to recent Prednisone." *Id.* at ¶ 22. Plaintiff saw another nurse for abdominal pain on February 25, 2014. *Id.* at ¶ 23. A few weeks later, on March 3, 2014, Plaintiff saw another provider for reoccurrence of abdominal and chest pain. *Id.* at ¶ 24. At that visit, the provider diagnosed Plaintiff with "uncontrolled abdominal/chest pain" and referred him to the medical director. *Id.*

On March 10, 2014, Plaintiff saw Dr. Obaisi for his abdominal pain, who at that visit diagnosed Plaintiff with hyptertension and pain and ordered continued blood pressure medication and follow up. *Id.* at ¶ 25. Dr. Obaisi saw Plaintiff again on April 30, 2014, when Plaintiff reported his concerns about a couple of lumps he recently discovered in his groin region, as well as occasional nausea. *Id.* at ¶ 26. Dr. Obaisi diagnosed Plaintiff with gastritis, dermatitis, pelvic and chest wall (pelvic muscle) tender area, and ordered several blood tests and an x-ray. *Id.* He also prescribed Zantac and Tramcinolone cream and ordered a follow-up in four weeks. *Id.* At the follow-up appointment on May 29, 2014, Plaintiff saw Dr. Obaisi for complaints of "left flank pain." *Id.* at ¶ 28. Dr. Obaisi assessed Plaintiff with abdominal pain on the left side, ordered an ultrasound of the abdomen, and ordered medications for asthma and skin lotion. *Id.* The ultrasound revealed no abnormalities. *Id.* at ¶ 29.

About a month later, on June 24, 2014, Plaintiff saw Dr. Obaisi for complaints of pain in the left lower quadrant with occasional nausea and diffuse abdominal

discomfort. *Id.* at ¶ 30. Dr. Obaisi diagnosed spastic bowel syndrome; prescribed Bentyl, Fiber-lax, Zantac, and Tylenol with codeine; and ordered a urinalysis, which results turned out negative. *Id.* at ¶¶ 30–31.

On August 30, 2014, Plaintiff saw Dr. Martija for a follow-up for his abdominal pain. *Id.* at ¶ 32. At that visit, Dr. Martija noted that the past tests relating to his abdominal complaints revealed no abnormalities and diagnosed Plaintiff with left lower quadrant pain, likely from constipation, as well as a chronic non-healing wound on his right foot. *Id.* Dr. Martija ordered a laxative for Plaintiff's abdominal pain and antibiotics for Plaintiff's right foot wound; she also referred Plaintiff to Dr. Obaisi. *Id.*

On September 4, 2014, Plaintiff saw Dr. Martija for a follow-up on his right foot wound and complained to her of increasing pain. *Id.* at ¶ 33. At this visit, Dr. Martija ruled out "Madura foot" and prescribed Plaintiff a Betadine daily soak for 10 days, Bactrim DS, and Motrin 400 mg every 4 hours as needed. *Id.* Dr. Martija additionally ordered a culture and sensitivity to the foot wound, provided him a crutches permit, and ordered a foot x-ray to rule out osteomyelitis. *Id.* The culture ultimately revealed no fungal elements, and the x-ray showed no bony pathology or osteomyelitis. *Id.* at ¶¶ 34–35.

On September 11, 2014, Plaintiff saw Drs. Obaisi and Martija because he had a whole-body rash. *Id.* at ¶ 36. Plaintiff was diagnosed with a fungal infection of the skin and prescribed an antifungal medication, ketoconazole. *Id.* At some point, Dr.

Obaisi also ordered another antifungal, Diflucan, and an antibiotic known as Dapsone. *Id.*

On September 12, 2014, Plaintiff went to the HCU for a foot sore and dressing change to his right foot; he received a foot soak and new dressings. *Id.* at ¶ 37. Three days later, on September 15, 2014, Plaintiff saw Dr. Obaisi for dermatitis on his right foot. *Id.* at ¶ 38. Dr. Obaisi ordered that Plaintiff "continue the same care" and follow up with Dr. Martija. *Id.*

On September 24, 2014, Plaintiff saw Dr. Obaisi again for his right foot, at which time Dr. Obaisi noted that the right foot sole sore was completely healed and discontinued crutches and soaks. *Id.* at ¶ 39. Plaintiff disputes Dr. Obaisi's assessment that his right foot was, in fact, healed at the time. [220] at ¶ 39. On October 7, 2014, Plaintiff again saw Dr. Obaisi for a follow-up on his right foot sole; Dr. Obaisi examined the foot and noted that the dermatitis on the right foot sole was healed. [197] at ¶ 40. Again, Plaintiff disputes that his right foot sole was, in fact, healed. [220] at ¶ 40.

A couple weeks later, on October 22, 2014, Dr. Martija examined Plaintiff at the request of Stateville assistant warden Calloway. [197] at ¶ 41. Dr. Martija noted "2 patches of vesicular lesions on dorsum of foot, some burst & weeping, serosanguinous fluid, positive inflammatory discoloration, mild edema right foot, non pitting[;] Discoid area in sole of right foot, some vesicles of sero sanguinous seepage." *Id.* at ¶ 41. Dr. Martija diagnosed Plaintiff with chronic eczema and ordered Lidex

ointment and an antihistamine. *Id.* She also noted that Plaintiff could bear weight and therefore did not require crutches. *Id.*

### IV. Medical Treatment at Stateville in 2015

On January 20, 2015, Dr. Obaisi examined Plaintiff, noting the existence of an erythematous papule patch on Plaintiff's right foot, as well as spots on the toes of both feet. *Id.* at ¶ 42. Dr. Obaisi's diagnosis remained dermatitis. *Id.* Plaintiff was scheduled for a "punch biopsy" of his right foot on two occasions but did not actually receive one on either occasion. *Id.* at ¶¶ 42–43.

On February 18, 2015, Dr. Obaisi saw Plaintiff again and noted that his skin rash was clearing. *Id.* at ¶ 44. Plaintiff complained of occasional constipation and abdominal pain at this visit. *Id.* Dr. Obaisi assessed Plaintiff with "resolving dermatitis" and ordered Plaintiff to take an antifungal and to receive a follow-up. *Id.* The next month, Plaintiff reported to Dr. Obaisi that his skin rash had improved but that he had run out of medicine. *Id.* at ¶ 47. Dr. Obaisi observed a small spot of peeling off pink skin rash on Plaintiff's right foot, diagnosed Plaintiff with dermatitis, and prescribed more antifungal medication. *Id.* Dr. Obaisi further scheduled a "punch skin biopsy" for April 6. *Id.*

Plaintiff underwent his small punch biopsy on April 6 with Dr. Obaisi; the results were negative for fungal organisms. *Id.* at ¶ 48. Two weeks later, on April 20, 2015, Plaintiff saw Dr. Obaisi for a follow-up, at which point Dr. Obaisi noted that Plaintiff's rashes were smaller, dry, and healing. *Id.* at ¶ 49. Dr. Obaisi diagnosed

Plaintiff with dermatitis and provided Tylenol, continued medications for blood pressure, and added an antiviral medication. *Id.*

On April 26 and 27 and May 7, 2015, Plaintiff saw various providers at the HCU but made no complaints of abdominal pain or foot problems. *Id.* at ¶ 50. Then, on May 12, 2015, Plaintiff saw Dr. Obaisi for left chest pain. *Id.* at ¶ 51. Dr. Obaisi ordered a chest x-ray, which came back normal. *Id.* Later that year, on August 31, 2015, Plaintiff saw Dr. Martija for a left big toe injury. *Id.* at ¶ 52. An x-ray revealed no fracture or dislocation. *Id.*; [220] at ¶ 52.

On September 9, 2015, Dr. Obaisi saw Plaintiff because Plaintiff was experiencing dermatitis in his left foot and feeling pain spreading from his lumbar area down to his left testicle. [197] at ¶ 53. At this visit, Dr. Obaisi diagnosed Plaintiff with chronic dermatitis and lumbar area pain and ordered an x-ray of the dorsal/lumbar spine, which revealed mild scoliosis. *Id.* Dr. Obaisi prescribed Triaminolone ointment and Voltaren. *Id.*

Dr Martija examined Plaintiff again on September 29, 2015 for abdominal pain. *Id.* at ¶ 54. Because she believed the Voltaren Dr. Obaisi prescribed caused the abdominal pain, Dr. Marija discontinued Plaintiff's usage of Voltaren and provided Zantac to relieve the pain. *Id.*

On October 27, 2015, Plaintiff saw a PA Williams for a "recurrent foot infection." *Id.* at ¶ 55. Williams diagnosed Plaintiff with eczema with infection and prescribed a host of medicines. *Id.* A few days later, on November 5, Plaintiff saw

Dr. Obaisi complaining of abdominal pain on his left side. *Id.* at ¶ 56. Dr. Obaisi diagnosed Plaintiff with irritable bowel syndrome (IBS) and prescribed Bentyl. *Id.*

On November 17, 2015, Plaintiff saw Williams for his foot issues; Williams continued prescribing Plaintiff Lidex and minerin ointment and ordered a foot soak every day for 14 days. *Id.* at ¶ 57.

On December 1, Plaintiff saw Dr. Martija again for persistent abdominal pain in his left lower quadrant. *Id.* at ¶ 58. Dr. Martija noted that Plaintiff experienced regular bowel movements, no anorexia, no vomiting, and no weight loss. *Id.* She diagnosed him with "abdominal pain, not acute," and ordered several blood tests and a urinalysis, all of which returned back normal. *Id.*

After this visit, Plaintiff never saw either Dr. Obaisi or Dr. Martija again about his foot or abdomen. *Id.* at ¶ 59. The IDOC transferred Plaintiff out of Stateville to a new facility in December 2016. *Id.* at ¶¶ 59, 61.

### V. Plaintiff's Grievances

Pertinent to his claims against prison administrator Defendants Parrish, Williams, and Knauer, Plaintiff filed a number of grievances throughout his stay at Stateville.

On August 8, 2014, Plaintiff filed a grievance about his stomach problem, to which Parrish responded that Plaintiff "appears to be receiving appropriate medical care" based upon the fact the medical providers saw him on August 21 and 30, 2014. [206] at ¶ 22. The warden's office concurred with Parrish's conclusion. *Id.* On September 5, 2014, Plaintiff filed another grievance about abdominal pain; Parrish

again denied this grievance because Plaintiff was "receiving appropriate medical care," and the warden's office concurred with Parrish. *Id.* at ¶ 23; [206-4] at 1. Plaintiff filed a grievance concerning his right foot pain on October 5, 2014, complaining of a treatment Dr. Martija provided that gave him no relief, [206] at ¶ 24, and then another grievance on October 7 regarding his foot pain, alleging that Dr. Obaisi was failing to treat his foot in retaliation for Plaintiff's submission of prior grievances, *id.* at ¶ 25. The grievance counselor denied both grievances after noting that Dr. Martija saw Plaintiff twice after he wrote the grievances and ordered ointment and antibiotics. *Id.* at ¶ 26. The warden's office and Knauer both concurred with this denial. *Id.*

On October 22, 2014, Plaintiff filed another grievance concerning his right foot pain. *Id.* at ¶ 27. In response to this grievance, Parrish concluded that Plaintiff "appears to be receiving appropriate medical care" because Dr. Martija saw Plaintiff on October 22, 2014. *Id.* at ¶ 28. Again, the warden's office and Knauer both concurred with Parrish. *Id.*

On November 2, 2014, Plaintiff submitted another grievance complaining about abdominal pain and requesting an outside specialist referral. *Id.* at ¶ 29. On December 18, 2014, Parrish denied the grievance again on the ground that Plaintiff appeared to be "receiving appropriate medical care" as he had just seen a nurse and was scheduled to see the medical director on December 21, 2014; both the warden's office and Knauer concurred with this denial. *Id.*; [206-8]. Two months later, on January 6, 2015, Plaintiff filed another grievance about both his foot and abdominal

pain, to which Parrish responded on February 22, 2015 that Plaintiff was receiving appropriate medical care and that Plaintiff had been seen multiple times by Dr. Obaisi and received medication. [206-9] at 1; [206] at ¶ 30. The warden and Knauer concurred with Parrish's denial of Plaintiff's grievance. [206] at ¶ 30.

Plaintiff filed another grievance on January 31, 2015 about his stomach pain and his foot. *Id.* at ¶ 31. On March 6, Parrish responded once again that Plainitff "appears to be receiving appropriate medical care," noting that Dr. Obaisi had determined Plaintiff's rash appeared to be resolving and that Plaintiff had received medication for his abdominal pain. *Id.*; [206-10] at 1. Parrish again denied the grievance, and the warden and Knauer concurred. [206] at ¶ 31.

On February 5, 2015, Plaintiff filed a grievance regarding inadequate care for his foot pain. *Id.* at ¶ 32. Consistent with her previous responses, Parrish responded on March 13, 2015 that Plaintiff was receiving appropriate medical care because, among other things, Plaintiff had been seen by the medical director on February 18. *Id.*; [206-11] at 1. Again, the warden's office and Knauer concurred with Parrish's recommendation to deny Plaintiff's grievance. [206] at ¶ 32.

Finally, on February 19, 2015, Plaintiff filed a grievance about his foot and abdominal pain. *Id.* at ¶ 33. On May 26, 2015, Parrish denied this grievance, too, finding that Plaintiff "appears to be receiving appropriate medical care" and noting, among other things, that Plaintiff was scheduled for a follow-up with the medical director. *Id.*; [206-12] at 1. The warden's office and Knauer agreed with the denial of Plaintiff's grievance. [206] at ¶ 33.

12

In addition to the grievances Plaintiff submitted, he also wrote letters to Parrish and to Knauer requesting help with obtaining medical treatment. *Id.* at ¶¶ 17, 20.

## VI. Plaintiff's Claims and Procedural History

Plaintiff's (operative) amended complaint asserts claims against Drs. Martija, Obaisi, Williams, Knauer, and Parrish under 42 U.S.C. § 1983, alleging that they acted with deliberate indifference to his right foot condition in violation of the Eighth Amendment (Count I), and against those same Defendants, as well as Riliwan Ojelade and Dr. Osmundson, for deliberate indifference to his stomach issues in violation of the Eighth Amendment (Count II). [134] at ¶¶ 70–85. Plaintiff also brings a First Amendment retaliation claim against Dr. Martija, Dr. Obaisi, Riliwan Ojelade, and Dr. Osmundon (Count III), and an Eighth Amendment claim against Wexford and Warden Williams asserting that Wexford and Stateville maintained unconstitutional policies or procedures causing him to receive inadequate medical care (Count IV). *Id.* at 86–101.

By agreement of the parties, this Court dismissed with prejudice all claims against Ojelade and Dr. Osmundson. [226]. The remaining Defendants have moved for summary judgment on all claims. [196]; [199].

## ANALYSIS

The various Defendants have moved for summary judgment on various grounds. This Court analyzes each set of claims in turn below.

## I. Eighth Amendment Claims

This Court first considers Plaintiff's Eighth Amendment claims. The Eighth Amendment requires prison officials to provide healthcare to incarcerated inmates who cannot obtain healthcare on their own, *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021), and imposes liability on prison officials who act with deliberate indifference to a substantial risk of serious harm to inmates, *Eagan v. Dempsey*, 987 F.3d 667, 693 (7th Cir. 2021). The deliberate indifference standard encompasses both objective and subjective elements: "(1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety." *Eagan*, 987 F.3d at 693 (quoting *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006)); *see also Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021).

The objective component requires Plaintiff to demonstrate that he possessed a medical condition that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021) (quoting *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012)). The subjective element, on the other hand, requires Plaintiff to prove that Defendants acted "with a 'sufficiently culpable state of mind.'" *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 (7th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The Seventh Circuit has characterized this as a "high hurdle" because a plaintiff must

14

demonstrate "something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotation marks omitted). In other words, a defendant must have made a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)).

### A. Objectively Serious Medical Conditions

Initially, the Wexford Defendants (Wexford, Dr. Obaisi, and Dr. Martija) move for summary judgment on the basis that Plaintiff did not possess an objectively serious medical condition, characterizing his abdominal pain as nothing more than constipation and his foot issues as insufficiently serious. [198] at 4–8. This Court disagrees.

As to the abdominal issues, the record shows that Plaintiff's condition persisted for multiple years and required treatment at multiple points in 2014 and 2015. For instance, at one point in March 2014, a provider diagnosed Plaintiff with "uncontrolled abdominal/chest pain." [197] at ¶ 24. That same year, Dr. Obaisi diagnosed Plaintiff with gastritis and spastic bowel syndrome and prescribed medication to treat his symptoms, *id.* at ¶¶ 26, 30, and in 2015, Dr. Obaisi diagnosed Plaintiff with IBS and prescribed Bentyl to treat this condition, *id.* at ¶ 56. The evidence demonstrates that Plaintiff had a medical condition that "has been diagnosed by a physician as mandating treatment," and thus, Plaintiff meets the

objective component of the Eighth Amendment analysis with respect to his gastrointestinal issues. *Thomas*, 2 F.4th at 722; *see also, e.g.*, *McCoy v. Wexford Health Sources, Inc.*, No. 12 CV 5467, 2018 WL 4563076, at *4 (N.D. Ill. Sept. 24, 2018) (finding the existence of an objectively serious medical condition where the plaintiff presented evidence of chronic gastrointestinal problems including abdominal pain, diarrhea, and bloody stool); *McIntosh v. Bowens*, No. 18-CV-1610, 2021 WL 3524176, at *4 (E.D. Wis. July 6, 2021) (noting that a plaintiff sufficiently establishes an objectively serious medical condition by presenting evidence of complaints about stomach issues for several months that ultimately culminate in a diagnosis of conditions like IBS).

Plaintiff similarly presents sufficient evidence that the skin condition affecting his foot constitutes an objectively serious medical condition. While an "uncomfortable skin issue that responds to treatment is not an objectively serious medical need," an "infected skin wound can rise to the level of any objectively serious medical condition." *Fryer v. Ledvora*, No. 14 C 9199, 2017 WL 36445, at *5 (N.D. Ill. Jan. 4, 2017); *see Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (holding that the plaintiff, who suffered from a purulent draining infection accompanied by excruciating pain and a fever in excess of 100 degrees qualified as sufficiently serious); *see also, e.g.*, *Willis v. Loftin*, No. 11 C 1315, 2014 WL 3821977, at *5 (N.D. Ill. Aug. 4, 2014) (noting that the parties did not dispute that the plaintiff's eczema condition constituted an objectively serious medical condition). Here, Plaintiff has presented evidence of chronic eczema plaguing his foot, which at one point became infected, and at other

16

points required medication, including antibiotics. *See* [197] at ¶¶ 32, 48, 55, 57. This suffices to overcome summary judgment on the issue of whether Plaintiff's skin condition satisfies the objective component of the Eighth Amendment test. *See Thomas*, 2 F.4th at 722.

### B. Drs. Martija and Obaisi

Drs. Martija and Obaisi next argue that, even if Plaintiff demonstrates that he possesses objectively serious medical conditions, Plaintiff nonetheless fails to raise a triable issue as to the subjective element of the Eighth Amendment analysis—that Defendants displayed deliberate indifference, or in other words, "something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald*, 982 F.3d at 458.

To prove this subjective element against medical professionals such as Drs. Martija and Obaisi, Plaintiff must show that each made a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Donald*, 982 F.3d at 458 (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). Mere negligence or a "mistake in medical judgment" does not constitute deliberate indifference. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has instructed that evidence sufficient to create a triable issue "might include the obviousness of the risk from a particular course of medical treatment," "the medical defendant's persistence 'in a course of treatment known to be ineffective,'" or "proof that the defendant's treatment

decision departed so radically from 'accepted professional judgment, practice, or standards' that a jury may reasonably infer that the decision was not based on professional judgment" *Id.* at 662–63 (quoting *Petties v. Carter*, 836 F.3d 722, 729–30 (7th Cir. 2016), *as amended* (Aug. 25, 2016)).

Plaintiff contends that both Drs. Obaisi and Martija displayed deliberate indifference to his foot condition by "brushing off" his wound for months. [219] at 6. Plaintiff's contention, however, fails to square with the record. Instead, the record reflects that both doctors consistently provided treatment for his wound. In August and September 2014, after Plaintiff first presented with foot issues, Dr. Martija treated him by providing him varying medications, a culture, and an x-ray; the culture and x-ray ultimately revealed no abnormalities. [197] at ¶¶ 32–35. Plaintiff then developed a whole-body rash on September 11, 2014, and Dr. Obaisi treated him with a different antifungal and a different antibiotic. *Id.* at ¶ 36. Plaintiff continued to receive treatment throughout the fall from both doctors: in September and October 2014, Dr. Obaisi examined Plaintiff and assessed Plaintiff's right foot as healed, *id.* at ¶¶ 39–40, and later in October 2014, Dr. Martija examined Plaintiff, diagnosed him with chronic eczema, and ordered medications for him, *id.* at ¶ 41. Dr. Obaisi continued to treat Plaintiff's foot issues in 2015: among other things, Dr. Obaisi performed a punch biopsy for Plaintiff on April 6, which returned back negative for fungal organisms, and prescribed him an antiviral medication. *Id.* at ¶¶ 48–49. In short, nothing in the record here establishes either a refusal to treat Plaintiff or a substantial departure from acceptable medical judgment. To the contrary, the

18

undisputed record shows ongoing care of Plaintiff's foot condition by both doctors, who examined him, provided him medications for his symptoms, and performed diagnostic tests. The doctors' "active monitoring" of Plaintiff's foot condition is the "antithesis of deliberate indifference." *Harper v. Santos*, 847 F.3d 923, 927 (7th Cir. 2017) (quoting *McGee v. Adams*, 721 F.3d 474, 482 (7th Cir. 2013)); *see also Lloyd v. Moats*, 721 F. App'x 490, 494 (7th Cir. 2017) ("Neither defendant disregarded [the plaintiff]'s complaints of foot pain or made outrageous treatment (or non-treatment) decisions; the record reflects a level of continuous care that is not consistent with a malicious state of mind.").

Plaintiff also faults Dr. Obaisi with his assessment that Plaintiff's foot was "healed" in the fall of 2014 when, according to Plaintiff, it was not. [219] at 6. This strikes the Court as a difference of opinion with a doctor's diagnosis or chosen course of treatment, and it is well-established that a "disagreement with a doctor's medical judgment is not deliberate indifference." *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007). Moreover, there is no evidentiary basis to infer any nefariousness from Dr. Obaisi's actions, such as that he deemed Plaintiff's foot healed out of malice or carelessness. Plaintiff suggests otherwise, pointing to evidence that two weeks after Dr. Obaisi determined his foot healed on October 7, 2014, Dr. Martija on October 22 examined Plaintiff again—this time at the request of an assistant warden—and noted lesions and a "weeping" wound on Plaintiff's foot. [219] at 6. This change in diagnosis, Plaintiff asserts, shows that Dr. Obaisi callously disregarded and deliberately determined his foot healed when he knew it was not. *Id.* But Plaintiff

presents no evidence (nor could he) demonstrating that the condition of his foot was the same when he saw both doctors 15 days apart. Even if he had, that evidence would, at most, suggest a misdiagnosis on the part of Dr. Obaisi, or alternatively, a difference of opinion between Drs. Obaisi and Martija. Neither a misdiagnosis nor a difference in judgment among physicians constitutes deliberate indifference. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation."); *Zackery v. Mesrobian*, 299 F. App'x 598, 601 (7th Cir. 2008) (holding that neither a misdiagnosis nor a difference in opinion among physicians was sufficient to establish deliberate indifference). Plaintiff thus fails to raise a triable issue of fact as to whether the doctors displayed deliberate indifference toward his foot condition.

Likewise, Plaintiff fails to offer sufficient evidence to overcome summary judgment as to the doctors' treatment of his gastrointestinal issues. His response brief is silent as to how Drs. Martija and Obaisi each individually displayed deliberate indifference to those issues, and thus, Plaintiff fails to carry his burden of raising a triable issue of fact. *See Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) (referring to summary judgment as the "put up shut up moment in litigation") (internal quotation marks omitted); *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (noting that to prevail on a deliberate indifference claim, an inmate must show an objectively serious medical condition that "*each* named defendant responded to with deliberate indifference) (emphasis added).

20

Regardless, the record confirms that neither doctor acted with deliberate indifference to Plaintiff's gastrointestinal issues. Plaintiff first saw Dr. Obaisi for his abdominal issues in February 2014, at which time Dr. Obaisi diagnosed him with spastic bowel syndrome and prescribed Bentyl. [197] at ¶ 20. Plaintiff continued to receive care from Dr. Obaisi throughout 2014 for his gastrointestinal issues; throughout this time, Dr. Obaisi examined Plaintiff, ordered diagnostic tests such as an ultrasound and a urinalysis, and prescribed various medications to treat Plaintiff's symptoms. *Id.* at ¶¶ 28–31. Given the consistent care Dr. Obaisi provided to Plaintiff, no reasonable jury could find that Dr. Obaisi displayed "something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald*, 982 F.3d at 458.

Likewise, there exists no evidence that Dr. Martija rendered unconstitutionally deficient care for Plaintiff's gastrointestinal issues. She saw Plaintiff on August 30, 2014 due to his complaints of abdominal pain, when she diagnosed Plaintiff with likely constipation and prescribed a laxative. [197] at ¶ 32. Dr. Martija did not see Plaintiff again for his gastrointestinal issues until September 29, 2015 when Plaintiff complained of abdominal pain. *Id.* at ¶ 54. At that appointment, Dr. Martija discontinued the use of a medication that Dr. Obaisi prescribed because she believed it was the cause of Plaintiff's pain, and she additionally provided Zantac to relieve Plaintiff's pain. *Id.* In December 2015, Dr. Martija examined Plaintiff again due to his abdominal pain, at which time she ordered blood tests and a urinalysis, which all returned back normal. *Id.* at ¶ 58.

Again, no reasonable juror could find that Dr. Martija displayed something approaching unconcern for Plaintiff's medical needs given that she continuously addressed and treated his complaints of pain. *See Harper*, 847 F.3d at 927.

In sum, Plaintiff has not presented evidence that Drs. Martija or Obaisi displayed deliberate indifference to his foot or gastrointestinal conditions. Accordingly, this Court grants summary judgment to these Defendants on Plaintiff's Eighth Amendment claims.

### C. Wexford's *Monell* Liability

This Court next considers Plaintiff's Eighth Amendment claim against Wexford. Under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), Wexford faces liability under section 1983 only for constitutional injuries caused by "(1) an express government policy; (2) a widespread and persistent practice that amounted to a custom approaching the force of law; or (3) an official with final policymaking authority." *Howell*, 987 F.3d at 653; *see also Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014).

Plaintiff does not identify an express Wexford policy, nor does he contend he sustained an injury caused by an official with policymaking authority. Instead, Plaintiff asserts that Wexford maintains a cost-saving custom or practice of refusing to pay for outside specialists. [219] at 10. Plaintiff, however, possesses no admissible evidence to substantiate this claim. He references an expert report from another case in this district—the *Lippert* Report—in which an expert witness opined that Wexford maintains a practice that makes it more difficult for inmates to access off-site

22

specialty care by, among other things, denying or delaying requests for specialty consultations and testing. *Id.* The expert opinion, so the argument goes, provides definitive proof of Wexford's cost-cutting practice. *Id.* Yet in *Wilson v. Wexford Health Sources, Inc.*, the Seventh Circuit recognized that the *Lippert* Report constitutes inadmissible hearsay where, as here, a plaintiff offers it to prove the truth of the matters asserted therein—namely, that Wexford maintained a practice of delaying or refusing inmates' access to specialists for the purpose of cutting costs. 932 F.3d 513, 522 (7th Cir. 2019); *see also, e.g.*, *Von Ryburn v. Obaisi*, No. 14 CV 4308, 2020 WL 3868715, at \*14 (N.D. Ill. July 9, 2020) ("Wexford is correct that many courts have excluded the Lippert Report on the ground that it is hearsay if offered to prove the truth of the matters asserted there."); *Boyce v. Wexford Health Sources, Inc.*, No. 15 C 7580, 2017 WL 1436963, at \*5 (N.D. Ill. Apr. 24, 2017) (excluding the Lippert Report as inadmissible hearsay). *Wilson* thus forecloses Plaintiff's attempt to use this piece of evidence to demonstrate that Wexford maintained a widespread cost-cutting practice.

Plaintiff also attempts to show that Wexford maintained a cost-cutting policy by pointing to the fact that Dr. Martija is not a board-certified doctor. Under a 2018 consent decree, Wexford can no longer hire non-board-certified physicians unless they demonstrate that they cannot hire board-certified ones. [219] at 10–11. Plaintiff fails to further develop this argument, resulting in its waiver. *See M.G. Skinner & Assocs. Ins. Agency v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments

23

unsupported by legal authority.").   In addition, Plaintiff puts forth no evidence that Wexford's hiring of non-board certified doctors is what caused him to receive constitutionally deficient medical care.   Plaintiff has no evidence, for example, indicating that a board-certified doctor would have provided him better medical care. Accordingly, he cannot demonstrate that Wexford's purported cost-cutting practice of hiring non-board certified doctors actually caused his alleged constitutional injury. Without evidence of causation, Plaintiff's section 1983 claim against Wexford fails as a matter of law.  *See Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1509 (2021).

For these reasons, this Court grants summary judgment to Wexford on Plaintiff's Eighth Amendment claim.

### D. Non-Medical Defendants

Next, this Court considers Plaintiff's section 1983 claims against the non-medical Defendants employed by the IDOC—Knauer, Parrish, and Williams—who in this case Plaintiff seeks to hold liable as prison administrators, not treaters.[2]

The Seventh Circuit has "long recognized that the division of labor within a prison necessitate that non-medical officials may reasonably defer to the judgment

---

[2] These Defendants hold themselves out as purely administrators without any formal medical training. [215] at 8.  While Plaintiff disputes that Defendants have presented sufficient admissible evidence that they lack medical training, *see* [207] at 3, there is no evidence suggesting that any of these Defendants provided any medical treatment to Plaintiff, and thus, this Court considers them non-medical prison administrators, *see Rasho v. Elyea*, 856 F.3d 469, 479 (7th Cir. 2017) (explaining that while prison administrators can double as medical professionals, courts should consider them as solely administrators where the plaintiff seeks only to hold them liable in their capacity as administrators and not treaters).

of medical professionals regarding inmate treatment." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 50 (2019); *see also Eagan*, 987 F.3d at 694 (observing that nonmedical officials are presumptively "entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care," and therefore do not act with deliberate indifference if they rely upon the judgment of medical personnel) (quoting *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008)). Non-medical officials cannot, however, "simply ignore an inmate's plight," and remain on the hook if Plaintiff demonstrates that a "communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety.'" *Arnett v. Webster*, 658 F.3d 742, 755–56 (7th Cir. 2011); *see also Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015) (observing that "prisoner requests for relief that fall on 'deaf ears' may evidence deliberate indifference").

The record contains no evidence that Parrish, Knauer, or Williams (in his capacity as the Stateville warden) ignored Plaintiff. Rather, it is undisputed that Plaintiff submitted multiple grievances throughout 2014 and 2015 complaining about his foot and abdominal issues; Parrish responded to each grievance, and the warden and Knauer concurred with her responses. [206] at ¶¶ 22–32. Ostensibly, Plaintiff believes he should have received better care and therefore is unsatisfied that his grievances were denied. *See* [207] at 8 (arguing that the IDOC Defendants' responses to his grievances evidences intentional or reckless disregard to his medical needs). But in this circuit, "a prison official cannot be found to have disregarded a risk merely

because they denied a grievance or other complaint"; rather, so "long as prison officials were making sure that 'medical care was available' while these grievances were processed, their actual ruling on a grievance or complaint does not constitute deliberate indifference." *McNeil v. Est. of Obaisi*, No. 16-CV-11256, 2020 WL 6392999, at *7 (N.D. Ill. Nov. 2, 2020) (quoting *Johnson v. Doughty*, 433 F.3d 1001, 1005 (7th Cir. 2006)). The undisputed record confirms, and as Parrish noted in her responses to Plaintiff's grievances, Plaintiff received constant medical care while he was incarcerated at Stateville for his abdominal and foot issues. The law precludes a finding of deliberate indifference as to the non-medical Defendants under these circumstances based upon their denials of Plaintiff's grievances. *See Giles*, 914 F.3d at 1050 (affirming summary judgment to non-medical officials where the plaintiff failed to produce evidence that his grievances were ignored or mishandled or that he otherwise received constitutionally inadequate care); *Hayes v. Snyder*, 546 F.3d 516, 527–28 (7th Cir. 2008) (affirming summary judgment to prison officials who referred prisoners' complaints that he was receiving inadequate medical treatment to the medical staff).

Plaintiff also argues that Defendants were "actually unresponsive to his complaints" that the doctors were withholding medical care in retaliation to his filing of prior grievances; as Plaintiff notes, the grievance responses indicated merely that Plaintiff was receiving ongoing medical care. [207] at 7. But again, as Parrish noted and the record confirms, Plaintiff was receiving ongoing, consistent medical care from both Drs. Martija and Obaisi, as well as other members of the medical staff at

26

Stateville. Thus, Defendants Parrish, Williams, and Knauer had no reason to believe that the doctors were withholding care for retaliatory purposes and were entitled to rely upon the judgment of the medical officials as to the proper course of treatment. *Giles*, 914 F.3d at 1049. And in any event, as this Court explains above (in discussing Plaintiff's deliberate indifference claims against the medical Defendants) and below (in discussing retaliation), no reasonable jury could find that Plaintiff received unconstitutionally deficient medical care or that Drs. Martija or Obaisi retaliated against him. Because "no reasonable jury could find that the Wexford defendants violated Proctor's constitutional rights, the state defendants cannot be liable for relying on the medical providers' exercise of judgment." *Proctor v. Sood*, 863 F.3d 563, 568 (7th Cir. 2017); *see also, e.g.*, *Dobbey v. Randle*, No. 10-CV-3965, 2015 WL 5245003, at *10 (N.D. Ill. Aug. 26, 2015) ("Here, because there is no evidence of deliberate indifference in the record against the Medical Defendants, there was no obligation for any State Defendant (none of whom is a medical professional) to assist beyond the care already being provided to Plaintiff."), *aff'd sub nom. Dobbey v. Miller*, 730 F. App'x 375 (7th Cir. 2018).

For these reasons, this Court grants summary judgment to the non-medical Defendants.[3]

---

[3] Although in his amended complaint Plaintiff also brings a section 1983 claim under a *Monell* theory against Williams in his capacity as Stateville warden, *see* [134] at Count IV, neither party addresses this claim and the record is devoid of any evidence that Stateville or the IDOC maintained an express policy, a custom or practice, or employed an official policymaker causing Plaintiff's alleged constitutional injuries. This Court thus also grants summary judgment to Williams on Plaintiff's *Monell* theory.

## II. First Amendment Retaliation Claim

Drs. Martija and Obaisi have also moved for summary judgment on Plaintiff's First Amendment retaliation claim. To prevail on this claim, Plaintiff must prove three elements: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in Defendants' decision to take retaliatory action. *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020); *Morris v. Scott*, 840 F. App'x 14, 15 (7th Cir. 2021), *as amended on denial of reh'g* (Apr. 1, 2021). Plaintiff lacks sufficient evidence to create a triable issue of fact on his retaliation claim as to either Defendant.

Plaintiff claims that Dr. Obaisi took away his crutches in retaliation for a grievance he wrote about his foot. [219] at 11. Filing grievances unquestionably amounts to protected First Amendment activity, *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020), and this Court presumes that depriving an inmate of crutches when he needs them to walk would likely deter future First Amendment activity. But Plaintiff's claim nonetheless fails to prove the third element of causation. The grievance which Plaintiff claims motivated Dr. Obaisi's retaliatory conduct is dated September 28, 2014, [221] at ¶ 17; [221-2] at 2, but Dr. Obaisi discontinued Plaintiff's crutches *four days earlier* on September 24, 2014, [197] at ¶ 39. As a matter of logic, Dr. Obaisi could not have taken away Plaintiff's crutches based upon a grievance that had not yet been submitted. Thus, Plaintiff's retaliation claim against Dr. Obaisi fails as a matter of law on the element of causation. *See Holleman*, 951 F.3d at 879

("Establishing the causation element of retaliation requires a showing that the *fact* of the plaintiff's engagement in protected activity was a motivating factor of the alleged adverse action"). Dr. Obaisi is thus entitled to summary judgment on Plaintiff's retaliation claim.

Plaintiff's retaliation claim against Dr. Martija fares no better. Plaintiff claims that Dr. Martija retaliated against him for filing grievances, *see* [219] at 11, but there is no evidence that Dr. Martija took any adverse action in retaliation. Nor does Plaintiff have any evidence that Dr. Martija knew of or saw any of the grievances he wrote. Accordingly, like Dr. Obaisi, Plaintiff cannot prove causation against Dr. Martija. *See, e.g.*, *Ames v. Shaw*, No. 16 C 9213, 2018 WL 6435656, at *6 (N.D. Ill. Dec. 7, 2018) (granting summary judgment on a retaliation claim because the plaintiff failed to produce evidence that the defendant knew about the First Amendment activity), *aff'd sub nom. Ames v. Hudson*, 790 F. App'x 831 (7th Cir. 2020). This Court therefore grants summary judgment to Dr. Martija on Plaintiff's retaliation claim.

## CONCLUSION

For the stated reasons, this Court grants Defendants' motions for summary judgment [196]; [199]. The Clerk is directed to enter judgment in favor of Defendants and against Plaintiff. Civil case terminated.

E N T E R:

Dated: September 7, 2021

_____
MARY M. ROWLAND
United States District Judge